**NORTON et al. v. HOUSTON et al.**
**(No. 9678.)**

(Court of Civil Appeals of Texas. Fort
Worth.   Oct. 29, 1921.)

1. **Appeal and error ⬥301—Errors not preserved by motion for new trial held not reviewable.**

Under Vernon's Sayles' Ann. Civ. St. 1914,
art. 1612, assignments of error will not be reviewed, where the alleged errors therein presented were not complained of in the court below in appellants' motion for new trial, or
otherwise, save by bill of exceptions taken to
the rulings at the time.

2. **Wills ⬥166(1)—Evidence held not to show undue influence.**

In a will contest, evidence *held* not to show
undue influence.

3. **Wills ⬥31—"Unsound mind" defined.**

Under Vernon's Sayles' Ann. Civ. St. 1914,
art. 7855, providing that every person over 21,
being of sound mind, shall have power to make
a will, the term "unsound mind" is a legal
term, and does not mean, when used in relation to the mental capacity necessary to making a valid will, some slight departure from
the normal or some temporary or occasional
lapse of memory (citing Words and Phrases,
First Series, Unsound Mind).

4. **Wills ⬥384—Failure to instruct on mental capacity held fundamental error, available on appeal without previous objection.**

In a will contest case, where on evidence
of only slight deviations from normal mental
soundness by testatrix the jury found her mentally unsound, failure to define "unsound mind"
on submitting special issue thereon to the
jury, as required by Vernon's Sayles' Ann. Civ.
St. 1914, art. 1984a, *held* fundamental error,
apparent in the face of the record, and available even in the absence of objection to the
charge and of a request for proper explanations and definitions and of failure to assign
error to the charge in the court below.

Appeal from District Court, Eastland County; Geo. L. Davenport, Judge.

Proceedings to probate a will by Mrs. Docia
Norton and others, contested by John Houston and others. From judgment denying the
probate, proponents appeal. Reversed and
remanded.

Turner & Seaberry and J. R. Frost, all of
Eastland, for appellants.

J. R. Stubblefield, of Eastland, for appellees.

CONNER, C. J.   On May 2, 1917, Mrs. E.
A. Houston executed a will in due form, devising all of her property to her daughter,
Docia Norton. Upon due application, the probate court of Eastland county on July 5,
1919, admitted the will to probate. From the
judgment probating the will in the county
court the contestants, the remaining children
of Mrs. Houston, appealed the case to the
district court, where a trial was had before
a jury, and, upon a verdict rendered on special issues of testamentary capacity and undue influence, judgment was entered denying
the probate of the will, and from this latter
judgment the proponents have appealed.

[1] Errors have been assigned to the charge
of the court, to the insufficiency of the evidence to sustain the verdict and judgment,
and to the rulings of the court in admitting
certain testimony. We do not feel at liberty
to consider the assignments 4 to 11 inclusive,
objecting to evidence, for the reason that
alleged errors therein presented were not
complained of in the court below, in appellants' motion for new trial, or otherwise,
save by bill of exception taken to the rulings
at the time. See V. S. Tex. Civ. Stats., art.
1612; Patterson v. Bushong, 196 S. W. 962.
We are therefore confined to the exceptions
made to the court's charge and to a consideration of the evidence upon which the verdict and judgment was founded.

The court submitted the two following issues:

"Special issue No. 1. Was Mrs. E. A. Houston of unsound mind on the 2d day of May,
1917, the date on which the instrument which
has been offered in evidence was executed,
and at the time the same was executed?

"Special issue No. 2. Did Joe Norton or his
wife, Docia Norton, at the time of the execution of the instrument, exercise an undue influence on Mrs. E. A. Houston, which caused
her to execute the instrument offered in evidence, and dated the 2d day of May, A. D.
1917?"

The jury answered both issues in the affirmative.

We have carefully considered the evidence,
and think it altogether insufficient to support
the verdict of the jury, upon the second issue especially; and the evidence on the first
issue, if not so lacking in probative force as
to require a reversal of the judgment, is such
as to emphasize objections to the court's
charge, which we will hereinafter discuss.

There is nothing inherent on the face of
the will which tends to show either undue
influence or a want of mental capacity on
the part of Mrs. Houston. H. B. Horn and
J. R. Frost were the subscribing witnesses.
H. B. Horn testified, in substance, that he
had known Mrs. Houston for 30 or 35 years;
that she was about 70 years of age at the
time of making the will; that he had had
many conversations with her and had visited
her home; that on the occasion of the execution of the will he talked with her for about
an hour and a half with reference to the
war and other general topics; that she discussed these subjects intelligently, and that
he discovered no evidence that her mind
was not as good as it had always been; that

Judge Frost read the instrument over to her, and she stated that was what she wanted, and gave as her reason for willing the land to Mrs. Norton that Mrs. Norton had waited on her and been good to her, and that the balance of the children had neglected her; that her mind was as it had always been, and that in his opinion she was of sound mind and disposing memory.

J. R. Frost, the other subscribing witness, testified that he had known Mrs. Houston some 25 years before her death; that he witnessed the signature of her will at her request; that during his acquaintance with Mrs. Houston he had acted as her attorney on many occasions, and that she was always able to intelligently discuss with him her business; that she died on the 17th day of December, 1918, about 19 months after making said will; that he had had considerable business for her in a professional way in the last few years, and that she was always able mentally to discuss her business in a clear and succinct manner; that he never noticed anything wrong, at any time, with her mental capacity, "in fact I never knew a woman of her age who seemed to have a clearer insight to her business affairs"; that after he read the will to her she discussed it a little, and then asked for it, and took it and read it over and said, "That is right; that is what I want"; that in his opinion she was of sound mind.

Dr. A. K. Weir testified that he was a graduate of a reputable medical college, and had visited Mrs. Houston on many occasions before and after May 2, 1917; that he never observed anything in her conduct which indicated mental weakness; and that he took her to be a woman of average mentality.

The proponents, Joe Norton and Docia Norton, each testified that Mrs. Houston was of sound mind for a person of her age; that she attended to her business by herself; and that she had lived with them for several years previous to the execution of her will.

On the other hand, Mrs. Dora Curtis, one of the contestants, gave it as her opinion that her mother was not of sound mind, stating that her mother would start to tell her something, and then start on something else; that she would confuse her (the witness) with Docia Norton; that her remembrance was bad; that "I observed nothing else unusual in her conduct that indicated the condition of her mind." The witness, however, acknowledged that she had not seen her mother for several months before her death, and that she did not know what the state of her mind was on the day she executed the will.

Jim Curtis, husband of Dora Curtis, testified that on several occasions Mrs. Houston saw him and would not recognize him; that on one occasion Mrs. Houston told him she did not have mind enough to know what she wanted to do about the place; she was nervous, and that she was not like she used to be; that she had sinking spells, and would "be all off for days"; that she was a wreck about eight months before her death.

John Houston, a son of Mrs. E. A. Houston, testified:

That he lived in Dickens county. That his mother had lived with him for some time after the death of his father. That she was weakly, and after his father's death her mind was wavery. "I know her mind was wavery, because she couldn't recollect, and she would tell me about these spells that she didn't know anything. The usual condition of her mind that I observed was just her conversations; from my observation of my mother and her manner of conversation, her general conduct and so on, just prior to the time of her death, I don't think she had a sound mind, not at no time along after my father died. * * * I seen her about a month before she died. I don't know, but I reckon it had been about a year before the 2d day of May that I saw my mother. I don't know the condition of her mind on the 2d day of May, 1917, when she executed the will; I wasn't there when she executed the will, and don't know the condition of her mind on that date. I would state that I didn't think it was good on that day. I don't know whether her mind was good or bad on that day, because I wasn't there."

Cap Houston testified:

That he was Mrs. Houston's youngest child. That he was married and a man of family. That he saw his mother very often. That he was living on the Crosby lease at the time of the death of his mother, something like a half mile from the Nortons. That it seemed to him that he reached the Crosby lease some time in May, 1917, but was not certain. That if he was not there at that time he was in Oklahoma, where he had been something like a year. That "there were certain peculiarities in her manner of conversation during the last few years of her life. It seemed like she would say things and then say she hadn't said them, very often she would say she wanted to see me, and when I would go to see her she would tell me to tell Cap to come there. There were other peculiarities that I observed. * * * From her manner of conduct and her conversations and from what I observed I don't think she was of sound mind during the last few years of her life."

On cross-examination he said, among other things:

"I will state that the condition of my mother's mind was not good on the 2d day of May, 1917. I had not seen her within a year before that date. I wouldn't state that her mind was good on the day she executed the will. I couldn't know what the condition of her mind was at that time. I was very sorry for my mother. I never did charge my mother with having sued me a few years before that to cancel the deed she made me. It is not my idea that she sued me to cancel the deed. It is a fact that I was sued to cancel a deed that she and her husband had made to me. I didn't

blame my mother for that. I thought Norton was responsible for that. At the time that suit was instituted my mother was living at Norton's. I didn't contest the suit with my mother. * * * We did compromise with her, and deeded her this property."

Ed Houston, another son of Mrs. E. A. Houston, testified:

That his father died about the 18th of November, 1906. That his mother lived with him 7 or 8 years after his father's death. That when he went to New Mexico he tried to get his mother to go with him, but she was old and did not think it would be a very good trip for her to take. That she was weakly, and he saw Joe Norton and told him that he was going to leave, and Joe Norton said for her not to go to John Houston, that there would be more trouble, and "if I would let him take her to his house there would be no more land trouble. He said; 'She is old and'— The first I knew that my mother had made a will was when it got in court here, after my mother's death. I didn't know she was sick prior to her death. I got a letter that she was sick from my brother's daughter, and I got on a train and started down here and got to Cisco, and I met Dan Curtis, and he told me she was already dead."

He further testified:

"I had a conversation with Joe Norton after I found out about the will. After my mother was dead, and I found out this will was in circulation, I went to Joe Norton, went to his house, and I told him, I says, 'Joe, you know what you promised me if I would take my mother to your place, and now,' I says, 'in the place of you doing what you agreed to do, you have got more trouble in court over the land.' He told me, 'As far as you are concerned, wait until this court is all over, and if I beat it, I will deed you yours back.' He says, 'I am not after you; it is Jim Curtis and John Houston I want to beat.'"

On cross-examination he testified:

That he did not know how long it had been since he had seen his mother before May 2, 1917. That he went to see her regularly. That his mother's mind was very bad on the 2d day of May, 1917, at the time the will was executed. That he did not know that he had seen her on that date. "Of course I wasn't there; if I had been, there would not have been any will wrote. I didn't see her on that date. Her mind was bound to have been bad on that date. I know it was. It hadn't been long since I saw her, a couple of weeks or a week. It is not a fact that I hadn't been down there in 12 months. I went and waited on her when she was sick, and stayed with her day and night. That was her first and last sickness. I was not there when she died; they never let us know. I was there just before she died. I didn't wait on her in her last sickness when she died. I would have done it if I had gotten word. I wasn't there, I don't believe, on the 2d day of May, 1917, and notwithstanding that fact and the fact that I didn't see her on that date I state positively that her mind was bad. It had been bad for some time. When she was staying with me, I have seen my mother sit right down in the floor with her hair over her face and squalling and saying somebody was trying to kill her. I have had the neighbors help me take her in the room and put her to bed. I lived on my father's place. My mother had both places in charge, getting income from both of them, and she lived on her own income."

Mrs. Cora Houston testified:

That she was the wife of Ed Houston. That the first year after the death of Mr. Houston, which was on the 18th day of November, 1903, the witness and her husband lived on the home place adjoining the lower place until in 1915. That Mrs. Houtson lived in their house some 3 or 4 or 5 years. That she waited on Mrs. Houston; did her washing and cooking and took care of her. That Mrs. Houston left their place to go to Joe Norton's on the last of June, 1915. "I saw her after that time. I didn't see her so very often until she had this spell of sickness, the spell of pneumonia. Before this will was made out, I was down there and helped wait on her, and it was along in April when I saw her last before this will was made. I don't know hardly whether I observed anything unusual in the condition of her mind. Her mind was—she has always had kinder queer spells along; so far as her mind is concerned, it is off and on all the time; she never had no recollection or nothing. She is easily influenced; anybody could influence her to do anything they wanted to. From my observation of her and what I saw of her general conduct, I wouldn't think she was of sound mind. I wouldn't think from the way she would do at times that she had a good mind. Some of the things that led me to that conclusion were: Sometimes the neighbors would come in, and she would jump on to them and say things to them without any occasion at all, and would seem to try to hurt people's feelings when they hadn't done anything to her at all, and give no reason for it. * * * As to whether or not I know whether Mrs. Houston was ever influenced to do anything wrong, I could have had a will to the place if I had wanted it. I don't know that she ever did anything wrong. She was a member of the church. I couldn't tell you whether or not she was active. I don't know that she went to church frequently. I lived there by her several years, and I never knew her to go but two or three times. I heard her mental condition questioned before this will was filed for probate. We had all spoke of her losing her mind; that we thought she was losing her mind, several times. I don't know whether she lost her mind or not. I don't know the condition of her mind on the 2d day of May, 1917, because I was not there. I think I was in Oklahoma at that time. I didn't come back about the 1st of June. We come back to Spur, Tex., in September, 1918. We came down to Eastland county, Tex., the last of September, 1918. I was not with her on the 2d day of May, 1917. I don't know anything about the condition of her mind at that time, no more than by the way it had always been for quite a while."

[2] Other than as has been indicated by the testimony given in substance and quoted

there is nothing to show that Mrs. Houston had in any manner been unduly influenced to make the will as she did. Both of the proponents, Joe and Docia Norton, testified that they at no time had made a request or sought to influence their mother in any way to make the will as it was, and the evidence fails to show that they were even present at the time the will was executed; and no witness testified to any conversation of either of these parties with the mother that would so indicate; nor is there any circumstance stated in the testimony, as we view it, that is of sufficient probative force to support the verdict of the jury on the second issue. In the case of Simon v. Middleton, 51 Tex. Civ. App. 531, 112 S. W. 441, it is said, among other things, that:

"Undue influence" is that "which destroys the free agency of this testator, and places him in a position where he is dominated by another, which acted directly on his mind at the very time when he executed the will. * * * The fact that some of the children are disinherited and others favored * * * raises no presumption of undue influence." The burden was on contestants to establish undue influence, and further to show that it was operating upon the mind of the testator at the time he executed the will, "and that the execution of the will was the outcome of the influence amounting to moral coercion, which destroyed his volition and caused him to make a disposition of his property which he did not wish to make."

In Wetz v. Schneider, 34 Tex. Civ. App. 201, 78 S. W. 394, the following is given as a test:

Was the influence "such that it induced the testator to act contrary to his own wishes, and to make a different will from what he would have made if he had been left free to exercise his own wishes and desires according to his own judgment and discretion? * * * If the influence was sufficient to constrain him to do what was against his will, so that his testament speaks the mind of another, and not his own, it is undue, and the will is void."

In the case of Scott v. Townsend, 106 Tex. 322, 166 S. W. 1139, Justice Phillips, of our Supreme Court, in discussing the issue of undue influence, said, among other things:

"The issue is proved only when free agency is shown to have been supplanted, which means a testament made under such subjection or surrender of the natural freedom of will and action as that it speaks the mind of another."

See, also, Trezevant v. Rains, 19 S. W. 567; Rounds v. Coleman, 189 S. W. 1086; Barry v. Graciette, 71 S. W. 309; Patterson v. Lamb, 21 Tex. Civ. App. 512, 52 S. W. 98.

Nor do we feel satisfied to sustain the verdict and judgment on issue No. 1, relating to Mrs. Houston's mental capacity at the time she made the will, even though it may be said that there is some evidence which, under a proper charge, would authorize the submission of that issue to a jury.

[3] Under article 7855, V. S. Tex. Civ. Stats., every person aged 21 years or upward, or who may be or may have been lawfully married, being of sound mind, shall have power to make a last will and testament, under the rules and limitations prescribed by law, and our courts have ever been careful to guard the rights of persons so qualified to dispose of their property as they will.

In 40 Cyc. p. 1004, it is said on this subject:

"The law requires, in determining mental capacity, not so much any particular character or intellect as the ability to make certain efforts of the mind and memory. The rule of testamentary capacity is that the testator must have sufficient mind and memory to intelligently understand the nature of the business in which he is engaged, to comprehend generally the nature and extent of the property which constitutes his estate, and which he intends to dispose of, and to recollect the objects of his bounty. If he possesses these attributes he has testamentary capacity. The testator need not have the same perfect and complete understanding and appreciation of any of these matters, in all their bearings, as a person in sound and vigorous health of mind and body would have; nor is he required to know the precise legal effect of every provision contained in his will. Absent-mindedness or mere intellectual feebleness does not disqualify a person to make a will, as the feeble have as much right to dispose of their property as the strong, but something short of insanity is sufficient to invalidate it. One capable of transacting ordinary business is presumed capable of making a will, although not entirely of sound mind; and one totally incapable of transacting ordinary business is ordinarily incapable of making a will, although one may have testamentary capacity, even though incapable of transacting ordinary business, or making a valid deed or contract."

[4] In the submission of issues it is generally required of us that a jury shall be charged with the law of the case, and article 1984a, V. S. Civ. Stats., particularly relating to the submission of special issues, reads, so far as pertinent, as follows:

"In all jury cases the court, upon request of either party, shall submit the cause upon special issues raised by the pleadings and the evidence in the case. Such special issues shall be submitted distinctly and separately, and without being intermingled with each other, so that each issue may be answered by the jury separately. In submitting special issues the court shall submit such explanations and definitions of legal terms as shall be necessary to enable the jury to properly pass upon and render a verdict on such issues."

The article quoted was added to our Revised Statutes by act approved March 29, 1913, and thereby it is made the plain duty of the court in submitting a case upon special

issues to therewith submit such "explanations and definitions of the legal terms as shall be necessary to enable the jury to properly pass upon and render a verdict on such issues." The term "unsound mind" is a legal term. See Words and Phrases, First Series, vol. 8, page 7212, title "Unsound Mind." It is there said, with citation of authorities, that:

"These terms [unsound mind] are of such variable significance that their value in any given case will depend entirely upon the relation that they bear to a particular person in connection with a particular act under inquiry. A testator who has sufficient mental power to collect his mind, without prompting, the particulars or elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive their obvious relations to each other and be able to form some rational judgment in relation to them, has sufficient mental power to make a will."

In the case of Brown v. Mitchell, 75 Tex. 9, 12 S. W. 606, Chief Justice Stayton said, among other things, on the subject:

"The court below might safely have informed the jury that the testatrix had testamentary capacity if her mind and memory were such as to enable her to know and understand the matters referred to in the charge at the time she executed the paper."

In Prather v. McClelland, 76 Tex. 574, 13 S. W. 543, the following charge was approved:

"Testator must have been capable of understanding the nature of the business he was engaged in, the nature and extent of his property, the persons to whom he might devise and bequeath it, the persons dependent upon his bounty, and the mode of distribution among them; that he must have had memory sufficient to collect in his mind the elements of the business to be transacted, and to hold them long enough to perceive at least their obvious relations to each other and be able to form a reasonable judgment as to them."

In the case of Trezevant v. Rains (Sup.) 19 S. W. 567, it was said:

"The rule of law governing the mental capacity required in executing testaments is that the testator need not possess the highest qualities of mind, and his mind may be weak and his understanding impaired; but it is sufficient if he is capable of understanding the nature of the business in which he is engaged, and of comprehending his property and of recollecting the natural objects of his bounty. In determining the extent of his mental capacity, it is not necessary to be shown that the testator actually understood and recollected these things, but that he was mentally capable of so doing."

See, also, Scott v. Townsend, 159 S. W. 342; Daley v. Whitacre, 207 S. W. 350; Edens v. Cleaves, 202 S. W. 355; Wolnitzek v. Lewis, 183 S. W. 819; Simkins' Administration of Estates, p. 677.

In the light of these authorities, it seems particularly important that the court should have observed the command of the statute and have given such explanations and definitions as were necessary to enable the jury to understand the degree of unsoundness of mind that was necessary for them to find. As it seems to us, without such explanation the court could not determine from the verdict that the jury believed from the evidence that Mrs. Houston at the time of the execution of her will was afflicted with that degree of unsoundness of mind which would render her will invalid. As stated in the authorities, unsoundness of mind is of variable meanings. It does not mean, as we have already seen, when used in relation to the mental capacity necessary to making a valid will, some slight departure from the normal or some temporary or occasional lapse of memory. The jury in question might reasonably have understood by the terms "unsound mind," unaccompanied by definition or explanation, that one was of unsound mind if the mind was weak, or intermittently weak, or naturally impaired by old age or otherwise, and we are not satisfied, under the evidence, that by the answer of the jury to issue No. 1 there is a finding of such unsoundness of mind as invalidates Mrs. Houston's will as originally probated, nor are we satisfied, as before stated, that the evidence so shows. Did we feel so satisfied, we would perhaps be required to impute a finding to that effect by the court, inasmuch as no objection to the charge was made below, nor was there a requested instruction presented. But the writer, at least, inclines to the opinion that in view of the affirmative language of article 1984a the failure of the court to give the proper definitions and explanations constitutes fundamental error, apparent on the face of the record, and available even in the absence of an objection to the charge and of a request for the proper explanations and definitions and of a failure to assign error to the charge in the court below.

For the reasons indicated, it is ordered that the judgment below be reversed, and the cause remanded for another trial.