**HANOVER CO., Inc., et al. v. HINES et al.**
**(No. 11997.)\***

Court of Civil Appeals of Texas. Fort Worth.
July 14, 1928.

Rehearing Denied Oct. 6, 1928.

*\*Writ of error granted.

Carrigan, Britain, Morgan & King, of Wichita Falls, for plaintiffs in error.

Bullington, Boone, Humphrey & King and Cox & Fulton, all of Wichita Falls, for defendants in error.

CONNER, C. J. On March 21, 1919, T. F. Mitchell and wife, Mrs. Sue Mitchell, executed and delivered to one Dan Cameron an oil and gas lease in the usual form, covering a tract of land consisting of 278 acres. Later, to wit, in 1924, Mrs. Sue Mitchell Hines, her husband having died and she having remarried, and others, instituted suit against the Hanover Company, Incorporated, who in the meantime had succeeded to the rights of Cameron, to cancel the Cameron lease, on the ground, substantially, of a failure to properly develop the land. A trial of that suit, on August 4, 1924, resulted in a judgment canceling the lease on 138 acres of land, and continuing and vesting in the Hanover Company and others the lease on 140 acres of the land; the judgment describing by metes and bounds the 140 acres so vested in the defendants in that suit.

Yet later, to wit, on September 2, 1926, Mrs. Sue Hines and others, as owners of the 140 acres of land above referred to, instituted the present suit against the Hanover Company and another to cancel and set aside the rights vested in the Hanover Company and said other person by the judgment of August 4, 1924. The ground upon which the cancellation was sought is substantially as in the first suit, to wit, that the defendants had failed to properly develop said 140 acres, and hence had abandoned the lease.

The pleadings are somewhat voluminous, but we think it sufficient as an introduction to further say that the material issues joined and contested on the trial of this case below, and brought for review before us, are indicated by the special issues submitted to the jury impaneled to determine the facts. These issues, together with the answers of the jury, are as follows:

"Special Issue No. 1. Did the defendant, the Hanover Company, Inc., E. P. Bowen, and G. I. Dorrance, prior to September 2, 1926, and subsequent to August 4, 1924, use reasonable diligence in developing for oil and gas the 140 acres of land described in plaintiffs' petition?

"Answer. No.

"Special Issue No. 2. Did the defendants, Hanover Company, Inc., E. P. Bowen, and G. I. Dorrance, prior to September 2, 1926, and subsequent to August 4, 1924, breach the duty of carrying out the essential purposes of the lease on the 140 acres described in plaintiffs' petition?

"Answer. Yes.

"Special Issue No. 3. Did the defendants, Hanover Company, Inc., E. P. Bowen, and G. I. Dorrance, prior to September 2, 1926, and subsequent to August 4, 1924, abandon the duty of carrying out the essential purposes in question?

"Answer. Yes."

Upon the verdict so returned, the court rendered judgment for the plaintiffs, Mrs. Sue Hines and others, for the recovery of said 140 acres of land, canceling all evidences of title thereto in the defendants. From the judgment so rendered, the defendants have duly prosecuted this appeal by writ of error.

Among other things, error is assigned to special issues 2 and 3. They were each objected to before their submission, on substantially the same ground, to wit, that they each left "the question of interpretation and construction of the lease in controversy to the jury, when in fact it is the duty of the court to construe said instruments." The objections were overruled, and later ignored on the hearing of defendants' motion for a new trial.

The lease to Cameron recites a consideration of $6,950 cash, and conferred the right upon the lessee of entry, etc., "for the sole and only purpose of mining and operating for oil and gas and of laying pipe lines," etc. By its terms it was made to remain in force for a period of three years from its date, and "as long thereafter as oil or gas, or either of them, is produced from said land by the lessee." The lessee covenanted to deliver to the credit of the lessors, "free of cost in the pipe lines to which he may connect his wells, an equal one-eighth part of all oil produced and saved from the leased premises. * * * Should the first well drilled on the above-described land be a dry hole, then and in that event, if a second well is not commenced on said land within six months from the expiration of the last rental period, which rental has been paid, this lease shall terminate as to both parties, unless the lessee on or before the expiration of said twelve months shall resume the payments of rentals in the same amount and in the same manner as hereinbefore provided."

The lease does not specify the number, location, or depth of the wells to be drilled, nor does it contain any clause of forfeiture, other than as above quoted. The evidence shows that some 14 wells have been drilled by the plaintiffs in error on the 140 acres of land in controversy, to a depth of about 500 feet. Of these 9 or more have been producing wells, at least 5 of which have continued to produce small quantities of oil by pumping. From the wells so produced, the defendants in error have been regularly accepting and receiving the specified royalties. The evidence shows that there are some 9 or more deeper sands, several of which in the general field have been oil-bearing in places. At least one of the witnesses referred to the various sands as "treacherous"; that is, substantially that

the oil stream or pool follows no direct or continuous line, and oil is obtainable only when the drill happens to strike the stream or pool.

The evidence further shows that in varying distances on the east, west, north, and south sides of the land in question wells to deeper sands had been drilled without production; the general area, apparently at least, being what is termed a shallow field. In this connection, it may be further stated that the evidence relating to the diligence of the plaintiffs in error to pump and operate the wells producing oil conflicted; that in behalf of defendants in error was to the effect that several owners and operators of nearby shallow wells had pumped their wells, some 16 hours, another 18 hours, and another 24 hours, in order to keep the water from the wells, thus producing at one time, at least, as much as 8 barrels a day. That in behalf of plaintiffs in error was to the effect that they employed for the purpose of pumping their wells men that they regarded as reliable and efficient, who, in connection with operating pumps on adjoining wells, pumped the wells in question about 6 hours a day; the method being to simply supply the power with gas, start the pumps, and let them run until the gas was exhausted, and go back the next day and do the same thing over, thus producing at the time of the trial from all five wells about two barrels of oil a day.

Mr. E. P. Bowen, one of the plaintiffs in error, testified: "I can only say that the lease has been handled out there in as workmanlike manner as a lease should be handled, as far as I have seen it in my visits to the lease. I have never abandoned that lease. My associates in this case have never abandoned that lease. We are still operating it. * * * I have spent possibly $150,000 out there. * * * I saw the judgment that was rendered by the plaintiffs in this case in August, 1924. After that occurrence, after the rendition of that judgment, I believe that there were two wells drilled; one is producing oil now. It was the last time I was on the lease."

As we read the record, the principal contention of the defendants in error is to the effect that the failure of plaintiffs in error to so operate the wells as to produce a greater amount of oil, and their failure to drill other wells and to deeper sands, amounts to an abandonment of the lease, which, under the holding of our Commission of Appeals in the case of Texas Co. v. Davis, 113 Tex. 321, 254 S. W. 304, 255 S. W. 601, automatically terminates all right, estate, and title vested in appellants by the lease and judgment under which they claim.

Under the foregoing state of facts and claims of the parties, we think special issues 2 and 3 are erroneous, and the action of the court in overruling plaintiffs in error's objection thereto requires a reversal of the judgment. By special issue 2 the jury was called upon to determine: (a) "The essential purposes of the lease;" (b) the "duty" thereby implied; and (c) whether the requirements of the lease had been "breached." Special issue 3 is of like import, the jury being called upon to determine whether the essential purposes of the lease had been "abandoned."

It seems plain that the "essential purposes of the lease" and the "duty" thereby imposed must be ascertained and determined by a judicial construction of the lease, which was for the court, and not the jury. So that it was for the court to determine whether the contractual requirements of the lease, express and implied, had been "breached" or "abandoned," after, and only until then, the jury could determine the issues of fact apart from questions of law. Neither the verdict nor the record otherwise discloses the interpretation of the lease or the standard of duty accepted by the jury. How, then, can it be said with judicial certainty that the property rights of plaintiffs in error in the lease in question have been disposed of by due course of law? It is elementary that the trial court should not submit to the jury for their determination an issue involving a mixed question of fact and law. It is likewise axiomatic that an issue should not be submitted to the jury, if the same involves the construction of a contract or written instrument, or if the same calls for the determination of a question of law by them.

In Varnes v. Dean (Tex. Civ. App.) 228 S. W. 1017, this court, in an opinion rendered by Mr. Justice Buck, passed upon the following special issues submitted to the jury in that case, to wit:

"Did the lease, as executed, actually contain the essentials of the written agreement previously entered into between plaintiff and the witness Holmes, if any there was?"

The objection to such issue was that it was not raised by the pleadings or evidence, and because it contained a mixed question of law and fact, on which the jury were not competent to pass. In discussing the issue and objection made to it, Judge Buck said:

"No direction is given to the jury in the charge as to what the essentials of the written agreement alleged to have been made by plaintiff and his wife and witness Holmes were. Nor is any issue of fact, unmixed and separate from questions of law, submitted in this issue. As to what were the essentials of the contract, the court should have determined, and submitted to the jury the difference which the plaintiff alleged and which the facts tended to establish between the two instruments. A charge of the court must submit questions of fact solely to the decision of the jury, but should not include questions of law, which the court only is authorized to

determine. We think this error is a material one and requires the reversal of the judgment."

In Totten v. Houghton (Tex. Civ. App.) 2 S.W.(2d) 530, the trial court submitted to the jury the following issue: "What would be the reasonable cost of remedying the defects or omissions in said building in such a way as to make such building conform to the contract and specifications?" To this the jury answered: "$1,995.75." The issue was submitted over various objections by the defendants, one of which was that the court submitted to the jury a question of law as to the construction of the contract, and what it would take to make the building conform thereto. It was held that the objection was good, upon the authority of Watson v. Patrick (Tex. Civ. App.) 174 S. W. 632; Hickory Jones Co. v. Mettauer (Tex. Civ. App.) 208 S. W. 745; Varnes v. Dean (Tex. Civ. App.) 228 S. W. 1017.

In Steinberg v. Morgan, 300 S. W. 253, it was said by the Amarillo Court of Civil Appeals that: "The construction to be placed upon the contract, where it is plain and unambiguous, is one for the court, and should not be submitted to the jury. This means that it is the duty of the court to construe for the jury the legal effect of an unambiguous instrument or a term thereof."

It is not alleged, nor does it appear, that the lease involved in this case is ambiguous, and we fail to understand how the jury could properly answer issues 2 and 3 unless they first determined what the essential purposes of the lease were. To do this they must analyze, interpret, and construe the lease itself. To do either of these things was to exercise a prerogative confided only to the court, and not given to the jury. What this or any other oil and gas lease means, with reference to the obligations imposed, is a question of law, to be construed by the court, and, as indicated, we think the court should have determined what, in his opinion, plaintiffs in error were required to do, and then have submitted to the jury by proper fact questions whether those things were done or not.

▮ Defendants in error insist, however, that if it be admitted that special issues 2 and 3 are objectionable, as pointed out, appellants waived such objections by their failure to prepare and request submissions of proper explanatory instructions correcting the errors. So far as pertinent, article 2189, Rev. Statutes of 1925, reads: " * * * In submitting special issues the court shall submit such explanations and definitions of legal terms as shall be necessary to enable the jury to properly pass upon and render a verdict on such issues."

Under like wording of previous revisions of the statutes, the wording quoted has been more than once construed. This court in Hines v. Hodges, 238 S. W. 349, writ of error refused, had the following to say:

"In Salado College v. Davis, 47 Tex. 131, in an action for unlawfully overflowing the lands of plaintiff, it was held that it was the duty of the court to instruct the jury as to the meaning of the word 'overflow.' In G., H. & S. A. Ry. Co. v. De Castillo (Tex. Civ. App.) 83 S. W. 25, it was held error to refuse an instruction defining 'contributory negligence.' In a recent case by this court (Norton v. Houston, 235 S. W. 963), in which a will was contested on the ground, among other things, of undue influence, we held that the court committed reversible error in failing to explain what was meant by 'undue influence,' even though in that case no special instruction on the subject was requested.

"In Davis v. Hardwick, 43 Tex. Civ. App. 71, 94 S. W. 359, it was held that it was error for the court to fail to explain 'what would amount to conversion.' In disposing of the question we said: 'We conclude that, under the peculiar facts of this case, the charge as a whole presented a misleading view, and that the specific objections above named are well taken. A failure of the court to define terms used in his charge will not ordinarily require a reversal. But this is not a rule of universal application. The duty of the court is to "so frame the charge as to distinctly separate the questions of law from the questions of fact" and "instruct the jury as to the law arising on the facts." Rev. St. 1895, art. 1317. In cases where terms embody conclusions of law and when, as we think is the case here, a failure to explain or properly apply terms used in a charge is calculated to mislead a jury, or to induce a verdict predicated upon a misunderstanding of the proper application to be given to such terms, the court will reverse. Harrison v. Houston, [40] Tex. Civ. App. [536] 91 S. W. 647.' "

In Connellee v. Nees, 266 S. W. 502, the issue of partnership was involved and submitted to the jury, and it was said by section A of our Commission of Appeals that the term "partnership" should be "defined and the issue submitted. We are not authorized to speculate as to whether the plaintiffs in error were injured by the failure of the trial court to comply with the provisions of these" authorities.

The case of M., K. & T. Ry. Co. v. Long (Tex. Com. App.) 299 S. W. 854, was one in which a material issue was whether a crossing at which the husband and father of the plaintiff in that case had been killed was "more than ordinarily dangerous as a nighttime crossing." Section A of our Commission of Appeals held that the term "more than ordinarily dangerous as a nighttime crossing" should have been explained to the jury, and that the failure to do so constituted error, even though a requested charge in behalf of defendant in that case was not full enough; the charge as given having been duly and seasonably excepted to on account of the failure to explain its terms.

In Norton v. Houston, 235 S. W. 963, decided by this court, the issue of whether a testatrix was of unsound mind was involved, and we held that, in submitting the special issue on the subject, the failure of the court to explain the terms quoted constituted fundamental error apparent on the face of the record, and available even in the absence of an objection to the charge, and of a request for proper explanation and definitions, and of a failure to assign error to the charge.

In the case of Robertson & Mueller v. Holden, 1 S.W.(2d) 570, section B of our Commission of Appeals held, quoting from the headnotes, that:

"In action for injuries tried on special issues, in which court defined term 'proximate cause,' failure of court on specific objection of defendant to omission of definition of 'new independent cause' to define such term was error requiring reversal under Vernon's Saylés' Ann. Civ. St. 1914, arts. 1971, 1985, and Vernon's Ann. Civ. St. 1925, art. 2189, though defendants failed to prepare and request special charge relative to such term. * * *

"Proper objection pointing out alleged defect in instruction is a sufficient predicate for reversal, whether defect in court's charge is an affirmative error or mere omission, and appellant need not have submitted a special charge to cure the defect or omission under Vernon's Sayles' Ann. Civ. St. 1914, arts. 1971 and 1985."

Article 2184 of the Statutes declares that, unless expressly waived by the parties, the judge "shall" prepare and deliver a written charge to the jury on the "law of the case." Article 2185 declares that the judge shall so frame his charge as to distinctly separate questions of law from questions of fact. And article 2189, from which we have already quoted, provides that in cases submitted on special issues the court "shall submit such explanations and definitions of legal terms as shall be necessary to enable the jury to properly pass upon and render a verdict on such issues." These statutes are all expressed in the imperative form, and under them and under the decisions cited above, and from which we have quoted, we think that appellants' objections to special issues 2 and 3 are sufficient to entitle appellants to complain of said issues in this court, regardless of their failure to request special explanatory instructions correcting the errors.

■ Appellees' further contention is that the errors, if any, in issues 2 and 3 are immaterial and harmless, in view of the jury's finding on issue 1. We have concluded that this contention should also be overruled. It is insisted by defendants in error that this suit is not one for forfeiture of the lease, but one for its cancellation, on the theory of the decision in the case of Texas Co. v. Davis, 113 Tex. 32, 254 S. W. 304, that the estate vested in the lessee of an oil and gas lease in the usual form is a determinable fee, which wholly ceases or terminates upon the lessee's abandonment of the essential purposes of the lease. But we think the case here is distinguishable from the case referred to. It is without dispute that in the Davis Case the original lessee, after having drilled one well, made a condition of forfeiture, wholly abandoned the lease, after which the original lessor again leased tlie land to others, and it was contended in behalf of the adverse claimants that the original lessee, having complied with the condition of drilling the one well, became vested with the fee in the oil and gas for the full period specified in the lease, and that such fee could not be reinvested in the lessor without a written conveyance, which was never executed, and hence that the leases made by him subsequent to said abandonment by the original lessee were without lawful effect.

But that is not this case. That was one in which the court was called upon to determine the effect of a complete abandonment of the lease, as construed by the court. We are not disposed to question the authority or reason of the court in the case of Texas Co. v. Davis. Nor are we in disagreement with what was therein incidentally said, to the effect that in every oil and gas lease of the kind proper diligence on the part of the lessee to develop the land and in production of the minerals after discovery must be implied. But neither that case nor any other we have found goes so far as to hold that a mere finding of negligence in doing these things during a good-faith effort on the part of a lessee to do so will of itself automatically terminate the lessee's estate. Such want of due diligence in these respects may and will subject the lease to forfeiture or the lessee to an action for damages, but in such cases the court is at liberty to exercise its equity powers.

■ With these preliminary observations, we will examine with a little more care issue 1 and the answer of the jury thereto. It is to be noted that the inquiry of the court was whether the plaintiffs in error had used reasonable diligence in "developing' the land in controversy for oil and gas. The jury were not called upon to find whether defendants in error had exercised diligence in producing the oil after its discovery, and it cannot be assumed that the jury did so find unless we are required to hold that diligence in production is necessarily included in the obligation to develop, and this we are not inclined to do. As it seems to us there is a very natural and plain distinction between the obligation to develop a tract of land, in order to determine the number location, and value of the oil-bearing sands if any, and the obligation to use due diligence in bringing the oil and gas to the surface, or to pre-

serve such minerals thereafter. There was no explanatory instruction by the court as to the meaning of "development" and "production," and it does not clearly appear from the evidence that the jury observed the distinction we have endeavored to point out. On the contrary, the evidence as a whole, as it seems to us, favors the view that the jury construed the term "development" as having reference to a failure of plaintiffs in error to use proper diligence in pumping their wells, for the greater amount and weight of the evidence seems to have been directed to this issue, which was neither specifically alleged nor submitted.

While it is true, as stated in the decisions, that an essential purpose of a lessor is to obtain a specified royalty it must likewise be true that an essential purpose on the part of the lessee in assuming the expense and obligations involved in accepting the lease is that he may receive all the minerals discovered and produced, except that which goes to the lessor Usually the self-interest prompting the desire and need for full development and full production is seven times more impelling on the lessee than on the lessor. We accordingly held in the case of T. & P C. & O. Co. v. Stuard, 269 S. W. 482, that:

"Lessee in development of leased premises for oil is required only to exercise sound judgment as to whether he will drill wells other than those specifically provided for in lease, and to exercise good faith and sound discretion as to how deep he will drill wells sunk on land, where no specific depth is mentioned or implied in lease."

■ In the case before us, plaintiffs in error, among other things, pleaded the judgment of August 4, 1924, as having concluded the questions involved, the judgment not having been reversed by appeal or otherwise. The parties to the suit in which that judgment was rendered were it was stated in open court on the submission of this case, and not denied, the same as in this case; the issue presented also being the same. If so, that judgment certainly settled and precludes any right in defendants in error for a forfeiture or cancellation of the lease on the 140 acres now in question, because of any prior failure of plaintiffs in error to drill to deeper sands or to use due diligence in bringing oil to the surface. The specific evidence upon which the judgment rests does not appear, but if the failure to wholly cancel the lease on the ground of a failure to drill to deeper sands was because of evidence to the effect that the field was, as a whole, essentially a shallow one, and that the deeper sands were of such treacherous and uncertain character as that a lessee, in the exercise of good faith, might lawfully refuse to incur the hazards and expense of a deeper drilling, the judgment would at least seem to conclude that issue,

unless, indeed, it shall be shown that subsequent to the date of the judgment further development of the field and changed conditions require development of the deeper sands. Of course, we do not wish to be understood as intimating that the judgment referred to will in any respect relieve plaintiffs in error from the duties of diligence in production and development arising and continuing since the date of the judgment.

Plaintiffs in error also pleaded that the defendants were estopped from maintaining the causes of action now asserted, and as relating to this issue Mr. Clark testified that he was the president of the Hanover Company, and had been in charge of operations since that company had acquired the lease; that he had kept pumpers on the land; that in March or April, 1925 (1926?), he discovered that the field notes in the judgment, describing the 140 acres of land in question, did not close; that he made an effort to have it cured, but was not successful; that "he made an offer in good faith that, if they would cure that description, he would proceed with further operations and further drilling of oil wells on this particular 140 acres."

Herman Mitchell, one of the defendants in error, testified, among other things, to the effect that he looked after the land for himself, his mother, and a younger brother, for whom he had been appointed guardian; that there are 15 or 20 wells on the tract that have been drilled, none of them deeper than 500 feet, possibly 600, "you (referring to examining counsel, Mr Cox) made a request of me for a correction of the field notes; the defendants never said anything to me about that, I never talked to Mr Clark about it." He further testified that Mr Cox had been his and his mother's counsel, and that "he (Mr. Cox) did come to me about the correction of the description; that the people wanted corrected. I did not agree to it. As to why I did not do it, did not agree to it, well, this suit, we were ready to file suit on it then. I had already employed counsel to file suit on it at that time."

This witness further testified that he had five sisters, who each own an undivided one-fourteenth of the one-eighth royalty in the land in controversy and that they had not been made parties to the suit; that five-fourteenths of the one-eighth royalty belonged to his five sisters, all of whom are married He further testified that a statement to which he referred showed that he had received, for himself, his mother, and brother, gross royalty of 339.16 barrels, and that he "never did go to these defendants here, and either of them and request to do other drilling."

■ Again referring to the errors as found by us in issues 2 and 3, we understand the rule to be that, if error be shown on appeal,

it requires a reversal of the judgment if there is any reasonable doubt of its harmful effect, unless it affirmatively appears from the record that the error was harmless. See Bell v. Blackwell, 283 S. W. 765, by section B of our Commission of Appeals. The jury, in answer to special issue 1, found that plaintiffs in error did not "use reasonable diligence in developing for oil and gas in the 140 acres of land described in the plaintiffs' petition." We do not feel satisfied, in the absence of proper explanatory instructions indicated in our ruling on issues 2 and 3, that the jury adopted the proper construction of the term "developing." They may have thought developing meant diligence in bringing the oil to the surface, which, as we have heretofore indicated, does not necessarily mean "developing" the land for oil and gas.

Moreover it is undisputed in the evidence that the lease in question has not been wholly abandoned. There has been at least a partial development of the land for oil and gas, and a partial effort to bring the oil discovered to the surface, for the benefit of all parties. And, as noted above, the defendants in error, prior to the institution of this suit, made no demand for greater development or greater diligence in pumping on the land in controversy.

In volume 1, Thornton's Law of Oil and Gas (4th Ed.) p. 540, is this statement: "If the lessor desires to declare a forfeiture of a lease for the reason that the land has not been fully developed, although the lessee has entered and developed a part of it, he must give notice to such lessee of his intention to declare forfeiture if the lease is not fully developed, and a reasonable time must be given for the development.' In support of this proposition, the author cites cases from Ohio, Indiana, Kentucky, West Virginia and the federal court.

In Mills & Willingham on the Law of Oil and Gas, at pages 167 and 168, we find this statement: "And in both those states which base the right of cancellation upon abandonment as well as those that predicate it upon forfeiture, it is usually required that notice be given to the lessee to perform the act for which a cancellation is sought; and the courts often allow the lessee a reasonable time to perform in order to save a forfeiture." The author cited cases from California, Pennsylvania, Kansas, West Virginia, and Oklahoma in support of the quotations cited. See, also, the case of Pipes v Payne, 156 La. 791, 101 S. W 144, and the case of Benavides v. Hunt, Trustee, 79 Tex 383, 15 S W. 396, by our own Supreme Court.

The opinion in Benavides v Hunt, Trustee, was by Chief Justice Stayton, a contract granting the right to mine coal and other minerals for a term of years being involved. Among other things, it was held that a temporary cessation was no ground for the forfeiture of the lease, and that, quoting from the headnote: "If cessation for a time actively to use property granted on condition that it shall be used for a named purpose be not such as to indicate clearly an intention to abandon an enterprise such as the parties in this cause were engaged in, then it would seem that before the lessor should be heard to claim a forfeiture he should show a demand that the lessee go forward with the enterprise, and a failure to do so, before his right to a forfeiture would exist under a contract such as that before us."

On the whole, we finally conclude that, for the errors pointed out in issues 2 and 3, the judgment of the court below should be reversed and the cause remanded, regardless of the fact, referred to in the testimony of the defendant in error Herman Mitchell, that his five sisters were jointly interested with the other defendants in error in the lease in question. The effect, if any, of such failure to join the sisters, will not be determined at this time, inasmuch as for some unexplained reason, perhaps on the theory that the estate of the lessee had been determined as to all parties, the fact of such failure seems to have been ignored on the trial and here, and the evidence on another trial may not be the same as now.

BUCK, J., not sitting.