### MILLER v. WHITTENBURG et al.
#### No. 5168.

Court of Civil Appeals of Texas. Amarillo.
June 3, 1940.

Rehearing Denied Oct. 21, 1940.

R. P. Moreland, of Plains, and W. A. Nelson and H. S. Lattimore, both of Fort Worth, for appellant.

Joe J. McGowan, of Brownfield, and Sanders & Scott, of Amarillo, for appellees.

STOKES, Justice.

This suit was filed by appellant, B. G. Miller, against J. A. Whittenburg, Jr., and Roy R. Whittenburg, as executors of the estate of J. A. Whittenburg, deceased, and also against them individually and against all of the other appellees (except the Denver Producing & Refining Company, a corporation) as heirs at law of J. A. Whittenburg, deceased. The Denver Producing & Refining Company was made a defendant because of its relation to the subject matter of the controversy as the owner of an oil and gas lease on the land involved from which it has been producing oil, the royalty from which is involved in this suit. The purpose of the suit was to establish a parol trust upon the title held by the appellees which, it is alleged in substance, arose in the following manner: Appellant alleged that in August, 1929, and prior thereto, he was the owner of Sections Nos. 830, 831 and 863, Block D, of the John H. Gibson Surveys, in Yoakum County, upon which he was indebted to Edward Manson in the sum of $4,616, besides interest, evidenced by ten vendor's lien notes of $461.60 each; that about the date mentioned he consulted J. A. Whittenburg concerning the indebtedness and induced Whittenburg to advance the money due on the vendor's lien notes and acquire them from the payee, Edward Manson, which Whittenburg agreed to do; that in order to adjust the indebtedness in a manner satisfactory to Whittenburg, and at Whittenburg's request, appellant executed a new note in the sum of $5,500, payable to J. A. Whittenburg, at Amarillo, in Potter County, and, as additional security thereof, he simultaneously executed a deed of trust conveying the three sections of land to George A. Whittenburg, as trustee, to secure the payment of the indebtedness so held by J. A. Whittenburg. He alleged that in November, 1931, he was delinquent in the payment of interest due on the note and was negotiating with the Panhandle Lumber Company in an effort to exchange his interest in the three sections of land for five houses and premises owned by the Lumber Company at Lubbock. He alleged that he consulted with J. A. Whittenburg and was advised by Whittenburg against making such an exchange. He alleged that in the conversation it was agreed between him and Whittenburg that appellant would allow Whittenburg to take and hold the record title to the three sections and that, in consideration thereof, Whittenburg agreed that one-half of the royalty from any oil or gas that may be produced from the land should belong to appellant and should at all times be held by Whittenburg in trust for him.

Further allegations are to the effect that appellant carried out his portion of the agreement and executed a deed and placed it in the bank at Amarillo to be delivered to Whittenburg, but that Whittenburg preferred the title through foreclosure proceedings and instituted suit upon the note in which he procured a judgment against appellant for the amount due thereon and foreclosed the deed of trust lien on the land which he thereafter purchased at the sheriff's sale on April 5, 1932.

J. A. Whittenburg afterwards died and on the 20th of July, 1937, the individual appellees, as his executors and surviving heirs, executed to the appellee, Denver Producing & Refining Company, an oil and gas lease under which the lessee Company prospected for, produced, and is still

producing, oil in considerable quantities. Appellant's suit is for the recovery of one-half of the proceeds of the royalty interests that have been collected by appellees under the oil lease and to establish a parol trust in his behalf upon the title held by the individual appellees through the alleged agreement which he had with their ancestor, J. A. Whittenburg, for one-half of the royalty interest in the land.

Appellees answered by numerous exceptions, general denial, the statute of frauds, the two, three, four and five years statutes of limitation, and other defenses not necessary to mention.

The case was submitted to a jury upon special issues, in answer to which the jury found, substantially, that in November, 1931, J. A. Whittenburg agreed with appellant that if appellant would let Whittenburg have the three sections of land he would allow appellant one-half of the royalty from any oil and gas that may be produced thereon and that the agreement was supported by a valuable consideration. They further found that appellant performed his part of the agreement; that appellees and their predecessor in title, J. A. Whittenburg, either in person or through persons claiming through them, had held peaceable and adverse possession of the lands in controversy for three years and for five years prior to November 23, 1938, and that J. A. Whittenburg breached the agreement with appellant in 1931 or 1932. Upon a motion filed by appellees the court rendered judgment upon the verdict in their favor apparently upon the theory that the findings of the jury upon the issues of three and five years limitation entitled appellees to a judgment notwithstanding the findings of the jury to the effect that the agreement alleged by appellant had been entered into between him and J. A. Whittenburg.

Appellant filed and urged a motion for a judgment non obstante veredicto and, after the same was overruled and judgment rendered in favor of appellees, he filed a motion for a new trial which was overruled and he duly excepted and perfected an appeal to this court.

The briefs contain a number of assignments of error, propositions of law and counter-propositions, but we do not deem it necessary to discuss them in their order. The controlling issues in the case are, first, whether or not the findings of the jury, in effect, that the parol trust was created, has support in the evidence and, secondly, whether or not the appellees were entitled to judgment under the statutes of three and five years limitation.

■ Since the decision of the Supreme Court in the case of James v. Fulcrod, 5 Tex. 512, 55 Am.Dec. 743, it has consistently been held by the courts of this state that, under our statute of frauds, it is permissible to ingraft by parol an express trust upon a deed which is absolute upon its face. Faville v. Robinson, 111 Tex. 48, 227 S.W. 938; Tieman v. Dyer, Tex.Civ. App., 114 S.W.2d 669. We think it is hardly necessary to explain the reasoning of Justice Hemphill in that pioneer decision. A marked distinction is observed between our statute of frauds, Vernon's Ann.Civ. St. art. 3995, and the English act for the prevention of frauds and perjuries which is, in effect, that the English act encompasses any contract or sale of lands, tenements or hereditaments, "or any interest in or concerning them," whereas our statute encompasses only "any contract for the sale of lands, etc." The question of whether or not a parol trust was established in the instant case depends upon the testimony of two witnesses, viz., Ben Miller, son of appellant, and G. M. Hamilton. According to the testimony of these witnesses, J. A. Whittenburg, who resided at Amarillo, in Potter County, in company with his son, George A. Whittenburg, who resided in Randal County, were at the Miller ranch, consisting of the three sections of land here involved, in the latter part of November, 1931. Ben Miller testified that on that occasion he heard a conversation between his father, the appellant, and J. A. Whittenburg in which the proposed exchange between appellant and the Panhandle Lumber Company was discussed, and that Mr. Whittenburg told appellant, in effect, that the old houses at Lubbock were probably too old to be capable of producing any revenue and that, if they were not so, the Lumber Company would not be wanting to dispose of them and that the Lumber Company would probably take them from appellant sooner or later. The record shows that the houses at Lubbock, were encumbered for several thousand dollars. This witness further testified that Mr. Whittenburg said to appellant: "I never sold any land. If you will let me take this land over, half the royalty is yours." He said that, in reply to these statements, appellant told Mr. Whittenburg that it seemed to be about as good a thing as appellant

could do and that he would just go ahead and let Whittenburg take it. The witness Hamilton testified that he also was present and heard the conversation. His version of it was that Whittenburg said to appellant that if appellant would let Whittenburg have the land and handle it, Whittenburg would "give him one-half royalty." He said that appellant then told ·Whittenburg that he would do that. There is no testimony in the record that either Whittenburg or appellant ever told any other' person of the alleged agreement. The record shows that in July, 1931, some four months prior to the alleged conversation at the Miller ranch, Whittenburg's attorneys began a course of correspondence with appellant in which they asked him to pay the delinquent interest on the note held by Whittenburg and threatened to file suit thereon. On August 12, 1931, appellant wrote the attorneys that they need not go to the expense of foreclosure proceedings because, if he could not procure a loan on the land, he would.convey it to Mr. Whittenburg and thus save the expense of foreclosure pro-'ceedings. The correspondence continued until December 17, 1931, when the attorneys filed suit in the district court of Potter County upon the note and to foreclose the deed of trust lien. On the 5th of March, thereafter, appellant executed and forwarded to the bank at Amarillo a deed in which he conveyed the land to J. A. Whittenburg in consideration of the cancellation of the $5,500 note and the liens securing the same, with instructions to the bank to deliver it to Whittenburg or his attorneys upon receipt of a release of the indebtedness. The deed was not accepted by Whittenburg, but his attorneys, on March 18, 1932, wrote to appellant, acknowledging receipt of a letter from him informing them of the deed and explaining to him that, after taking the matter under consideration, considering the fact that practically all necessary expenses had already been incurred in the foreclosure proceedings and notice of the sale had been published, they thought it would be best to go ahead and sell the land as advertised. They explained in this letter that Mr. Whittenburg had told them it was not his intention to preserve a deficiency judgment against appellant in the event the land did not sell for enough to pay the debt and the record shows that immediately after Whittenburg bought the land at the sheriff's sale, he cancelled the balance of the judgment remaining after crediting his bid and purchase price of $2,500.

Appellees contend that the alleged agreement as reflected by the testimony is insufficient as a matter of law to establish a parol trust. They assert in this connection that the evidence does not meet the legal requirements to establish such a trust which, they say, cannot be established except by clear, concise, convincing and conclusive proof. The law is well established that, in order to establish such a trust, the intention of the parties to create the relationship must be definite and particular, but this does not mean that the parties must use any set phrase or legal language in order to accomplish that result. If the language used by them, taken in its ordinary and accepted use among the class of persons using it, is sufficient to express their intention to create such a trust, it is sufficient under the law and no set form of expression is required. Mr. Bogert in his work on Trusts and Trustees, vol. 1, § 45, p. 197, says: "Courts of equity have sought to find the real meaning of language used by settlors and have construed it to indicate a trust intent if the legal incidents of a trust were desired, no matter how clumsy or unsuitable the phrases used."

Judge Sandidge, speaking for the Kentucky Court of Appeals, in Fox et al. v. Faulkner, 222 Ky. 584, 1 S.W.2d 1079, 1080, gave cogent illustration to this principle by a quotation from what he termed the celebrated bear case in Prewitt v. Clayton, 5 T.B.Mon., Ky., 4, 5, where it was said: "A bear well painted and drawn to the life is yet the picture of a bear, although the painter may omit to write over it, 'This is the bear.'"

Ben Miller testified that, in the conversation at the ranch, his father, the appellant here, brought up the subject of his proposed exchange of properties with the Panhandle Lumber Company and explained to Mr. Whittenburg the details of the pending negotiations. The matter was discussed between them and, according to this witness, it culminated in the offer of Whittenburg that "if you will let me take this land over, half the royalty is yours." This proposition was accepted by appellant. As an inducement to appellant to accept the proposition, Whittenburg explained to him that he (Whittenburg) never sold land, by which he evidently meant that if he acquired appellant's land it would not be sold to others, but would be held by Whitten-

burg and if oil should be produced thereon, appellant would, therefore, be certain to procure his portion of the royalty.

G. M. Hamilton's testimony was equally as clear and we think the testimony of these witnesses was sufficient to form a legal basis for the finding of the jury to the effect that the agreement was actually made. It may be well to analyze the language used by the parties when the trust agreement is alleged to have been made. Whittenburg, in effect, told appellant that, if appellant would let him have the land, half of the royalty would be Miller's. In connection with the proposition, Whittenburg reminded Miller that he, that is, Whittenburg, never sold land. As we view it, these expressions could mean nothing else except that Whittenburg proposed to take title to the land—all of it—and that Miller had no occasion to fear that he would not receive his portion of the royalty because Whittenburg never sold land and, therefore, there could be no cause to apprehend it would fall into the hands of innocent purchasers and in that way deprive Miller of the benefits of the trust agreement.

■ Appellees devote a large portion of their brief to an effort to show that Ben Miller's testimony was not plausible and that Hamilton's testimony was inconsistent. The record contains testimony which undoubtedly tends to render the testimony of these witnesses inconsistent with the real facts as detailed by the controverting witnesses. It was shown by a number of witnesses that during the month of November, 1931, J. A. Whittenberg was ill and confined to his bed, requiring the constant attention of a nurse; that he never left his room except for short intervals and that his condition required the attention of his nurse even on the short automobile trips he occasionally took for recreation. Other witnesses testified to facts which, if true, precluded the attendance of George A. Whittenburg at the ranch house of appellant in the latter part of November, 1931. While this testimony was calculated to cast doubt upon the truth of the positive statements of the witnesses, Hamilton and Miller, we cannot say that it did more than create a sharp issue of fact between the witnesses upon the question of J. A. Whittenburg and his son actually being present and the issue of whether or not the conversation was, as a matter of fact, had between J. A.

Whittenburg and appellant, and thereby created a question for the jury to decide. It was submitted to the jury and they found the conversation did occur. That finding being supported by the testimony of the two witnesses mentioned, we are not authorized to disturb it, nor was the trial court warranted in disregarding it unless the case is controlled by the statutes of limitation and the facts in reference to that question which we shall now discuss.

■ At the request of appellees the court submitted to the jury special issue No. 9 as follows: "Do you find from a preponderance of the evidence that J. A. Whittenburg in 1931 or 1932 breached the agreement with B. G. Miller?" which the jury answered in the affirmative. This suit was filed December 4, 1937, which was more than three years and, we shall assume, more than five years after the date referred to in 1932. The purpose of submitting the issue was to ascertain and fix a date for the inception of the periods of limitation pleaded by appellees. Appellant contends that this special issue submitted an issue, not of fact, but purely one of law and that the jury's finding thereon should be disregarded. It was held in Hanover Co. v. Hines, Tex.Civ.App., 11 S.W.2d 621, that the question of whether or not the requirements of the lease there involved had been breached was a question of law that should be determined by the court upon facts in reference thereto properly determined by the jury. Of course, it is elementary that only questions of fact should be submitted to the jury and those of law should be determined by the court, and we are strongly inclined to the opinion that the special issue here involved is subject to the criticism made by appellant. Waiving that feature of the contention, however, it is contended by appellees that the evidence was such as to show that, if there ever was an agreement between J. A. Whittenburg and appellant to the effect that the former would hold half of the royalty interests in the land in trust for appellant, the agreement was breached by the trustee Whittenburg in the year 1931 or 1932, thus setting in motion the statutory periods of limitation. They cite us to two features of the evidence which they contend reveal such a breach, one of which is the line of correspondence between appellant and Whittenburg's attorneys and the other consisting of the act of Whittenburg in bring-

ing suit against appellant to foreclose the deed of trust lien, the taking of judgment in that suit, selling the land under the judgment and the purchase of the land at the sheriff's sale. The correspondence between the attorneys and appellant concerning the indebtedness began July 31, 1931. In a letter of that date the attorneys notified appellant that unless the interest on the loan was paid on or before the 5th of August, Mr. Whittenburg would have to protect himself by foreclosure proceedings. We have carefully examined the entire correspondence and find nothing in any of the letters passing between the parties that would indicate a purpose or intention on the part of Whittenburg to cancel, repudiate, breach or in any manner affect any agreement that may have been made between appellant and Whittenburg concerning the matter of a trust agreement. We fail also to find anything in the foreclosure proceedings which is inconsistent with the alleged trust agreement. According to the witnesses, Ben Miller and G. M. Hamilton, the agreement did not encompass the details by which the title to the land would be placed in Whittenburg. According to Hamilton's version, Whittenburg told Miller that if Miller would let him have the land and handle it, as it was, Whittenburg would give him one-half of the royalty. Ben Miller's testimony was substantially to the same effect. After the foreclosure suit had been instituted by Whittenburg, Miller executed and forwarded to the bank at Amarillo a deed in which he conveyed the land to Whittenburg in consideration of the cancellation of the indebtedness. A few days after the deed was received by the bank, Whittenburg's attorneys wrote Miller a letter in which they said to him: "* * * After taking the matter under consideration, considering the fact that practically all the expenses have already been incurred in the foreclosure and notice of the sale published and the expense incurred for that, we think it would be best to go ahead and sell the land as advertised. Mr. Whittenburg tells us that it is not his intention to preserve a deficiency judgment against you if the land does not bring enough to pay his indebtedness. If you will meet us on the day of the sale, and the land is not sold to some one else for enough to take up Mr. Whittenburg's indebtedness and Mr. Whittenburg buys the land in, we will take up with you the matter of releasing any

deficiency judgment * * *." Thus it will be seen that the attorneys for Whittenburg expressed no purpose for persisting in the foreclosure proceedings other than the fact they had proceeded to the point where practically all of the necessary expenses had already been incurred. Nothing was said or even suggested in the correspondence that Whittenburg was, by the foreclosure proceedings, repudiating the trust nor was his purpose or intention to do so ever expressed by him or any of his representatives. The correspondence shows that Whittenburg was not compelled to acquire the title through foreclosure, but that he preferred to acquire it in that manner. The original trust agreement did not contemplate the manner in which the title would be transferred to Whittenburg and we cannot accede to the contention of appellees that these two acts of Whittenburg, that is, the insistence by his attorneys that he pay the note and the institution of the foreclosure proceedings were such as to constitute a breach or repudiation of the trust agreement. Other grounds are urged by appellees as bases for the finding of the jury that the trust agreement had been breached but they consist of the acts and conduct of appellant and cannot, we think, be construed into an abandonment of the trust by the parties nor of a breach or repudiation of it on the part of Whittenburg.

Moreover, even if Whittenburg entertained such a purpose, there is no testimony in the record showing that he or his attorneys ever at any time communicated it to appellant. The record shows that, although the land was worth $11,420 in 1932, several thousand dollars more than was due on the note held by Whittenburg at the time he filed suit thereon, appellant did not appear and contest the suit nor make any effort to conserve his equity therein. If he had the trust agreement with Whittenburg as testified to by the witnesses, then in the absence of notice of some kind that by the foreclosure proceedings Whittenburg intended to repudiate the trust, and in view of the absence from the agreement of the details and manner in which Whittenburg was to acquire title to the land, we do not think those proceedings and the course taken by Whittenburg to acquire the title necessarily constituted a breach or repudiation of the trust agreement. It is elementary that the statute of limitations does not begin

to run against an express trust until the trustee does some act or makes some statement by which the cestui que trust is informed of his intention to repudiate the trust. Brotherton v. Weathersby, 73 Tex. 471, 11 S.W. 505; Cooper v. Lee, 75 Tex. 114, 12 S.W. 483; Tomahagen v. Sarber, Tex.Civ.App., 29 S.W.2d 438.

[redacted] The agreement under which the express trust was created as found by the jury contemplated that Whittenburg should have and hold possession of the land and unless the trust agreement was repudiated the statutes of limitation would not apply to such possession. We do not find in the record anything which would form a basis for or in any manner support the findings of the jury upon the question of adverse possession insofar as appellant is concerned. His possession was in conformity with their agreement and, as we have said, no effective repudiation or breach of the agreement is shown by the testimony. There being nothing in the record to support the findings of the jury on the question of limitation and adverse possession, the court was not warranted in rendering judgment in favor of the appellees.

[redacted] Another contention made by appellees is that at the time of the alleged trust agreement, appellant, B. G. Miller, had no interest in the land other than that which could be conveyed by parol, that is, that, by virtue of the fact that Whittenburg's note of $5,500 had been executed and delivered to him by Miller in renewal and extension of vendor's lien notes, that Whittenburg held the complete title to the land, Miller's right thereto being only a contract for title conditioned entirely upon the payment of the vendor's lien notes held by Whittenburg. We understand this contention to mean that, because he held the superior title under the vendor's lien, Whittenburg was in possession of both the legal and the equitable title to the land and, therefore, an express trust could not be established thereon by parol. If appellees are correct in their premise, the legal conclusion is inevitable because it is a well established principle of equity that an equitable estate requires the simultaneous existence of two estates or ownerships in the same subject matter whether the property involved be real or personal. If, therefore, the vendor's lien held by Whittenburg invested him with both the legal and equitable titles, no express trust could be created by parol because such would be in direct violation of the provisions of our statute of frauds. 1 Pomeroy's Eq.Jur., 4th Ed., 178; Wheeler v. Haralson, 128 Tex. 429, 99 S.W.2d 885; R. L. Knight, Jr., et al. v. Tannehill Bros., 140 S.W.2d 552, recently decided by this court. We do not agree with appellees, however, in their contention that appellant did not own any interest in the land. It is well established law in this state that a vendor who retains a lien upon land to secure a portion of the purchase price holds the superior title until the deferred payments are discharged. He does not have any right to possession until maturity of the indebtedness. That right belongs to the vendee. While the title retained by the vendor is superior to that conveyed to the vendee, the latter does own an interest which is greater than a mere right to acquire title. Roth v. Connor, Tex.Civ.App., 25 S.W.2d 246. If the vendor retains the superior title the vendee acquires the inferior one. The title held by the vendor is designated by some courts as being the legal title which he holds in trust for the benefit of the vendee who must hold the equitable title which consists of the right to pay the indebtedness and acquire the entire title. Engelbach v. Simpson, 12 Tex.Civ.App. 188, 33 S.W. 596; Humphreys-Mexia Company v. Gammon, 113 Tex. 247, 254 S.W. 296, 29 A.L.R. 607. Under the condition of the title revealed by the record there is no question that an express trust could, under the law, be created by parol.

[redacted] We have carefully considered all of the contentions made by both parties and, in our opinion, under the evidence in the case and the findings of the jury upon the issues presented to them having reference to the establishment of a parol trust, the trial court should have entered judgment in favor of appellant for the value of one-half of the proceeds of royalty in the oil which had been collected by appellees and decreed a trust in favor of appellant for one-half of that which might thereafter be so collected by them or to which they should be entitled under the present lease or any future lease that may be made of the land. The record shows that Section 830 is school land and was leased by appellees under the provisions of Art. 5368 et seq. They, therefore, became entitled only to one-half of the usual royalty and, under the trust agreement, appellant is entitled only to one-half of

**388**

that to which appellees are entitled under the law.

The judgment of the court below will be reversed and judgment will here be rendered for appellant in accordance with the conclusions herein expressed. Appellant states in his brief, and the statement is not challenged by appellees, that, according to the undisputed testimony, the amount of royalty collected by appellees under the oil and gas lease up to June 1, 1939, is $38,506.16. The judgment will be for one-half of that amount, with interest from July 1, 1939, at the rate of six per cent per annum, and for one-half of all amounts subsequently so collected, in accordance with the express trust established by the evidence.

### On Motions for Rehearing.

Both the appellant and the appellees have filed motions for rehearing both of which we have overruled. In his reply to appellees' motion for rehearing, however, the appellant states that, in view of the unsettled state of the law relating to his claimed interest in the oil royalty from Section No. 830, which is a state school section, never having been patented, and other conditions mentioned by him, he is willing to remit his claim to the royalties that have been collected or received by appellees from, and all of his claim to, that section. He further states that the amount collected by appellees as royalty from the other two sections up to June 1, 1939, is $28,674.76, and this allegation is not in any way challenged by the appellees. Appellant asks this court to reform the judgment heretofore entered in the cause so as to allow him recovery of one-half of the above amount, together with one-half of all royalties collected after June 1, 1939, from Sections 831 and 863.

Appellant does not point out to us any portion of the record or testimony which segregates the amount of royalty produced on Section 830 nor the amount of money collected by appellees from oil production on that section and we have not been able to find any testimony in the record to that effect. In the original opinion we held that, under the verdict of the jury, appellant was entited to recover one-half of all of the royalty collected by the appellees from all three of the sections of land and he was awarded judgment therefor by this court. If appellant does not wish to collect the entire amount of the judgment awarded him but prefers to remit a portion of it, even though the record does not give

us a basis upon which to render a judgment for the exact amount remaining, we think he has the right to do so under the provisions of Article 2227, Revised Civil Statutes, 1925. That article permits any party in whose favor a judgment has been rendered to remit any part thereof either in open court or in vacation, and that execution shall issue for the balance only of the judgment. The judgment, after the remittitur, is in accordance with the findings of the jury and in no sense conflicts therewith. It conforms to the pleadings and gives relief to which, in our opinion, the appellant was entitled in the trial court. Certainly no prejudice nor injury can be imposed upon the appellees by such remittitur and the request of the appellant that the remittitur be allowed and the judgment reduced accordingly will be granted and the judgment reformed in accordance therewith. General Accident Fire & Life Assur. Corp. v. Bundren, Tex.Com.App., 283 S.W. 491.